UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTHONY WEST,

       Petitioner,

v.                                  CASE NO. 04-CV-40199-FL
                                     HONORABLE PAUL V. GADOLA

KURT JONES,

       Respondent.

_____/

## OPINION AND ORDER DENYING HABEAS CORPUS PETITION

Petitioner Anthony West has filed a *pro se* application for the writ of habeas corpus under 28 U.S.C. § 2254. The habeas petition challenges Petitioner's state conviction for second-degree murder. Respondent urges the Court to deny the petition. The Court agrees with Respondent that Petitioner's claims do not warrant granting the writ of habeas corpus. Accordingly, the habeas petition will be denied.

**I.**      **Background**

Petitioner was charged in Wayne County, Michigan with first degree (felony) murder and arson of a dwelling house. The facts leading to these charges have been summarized by the Michigan Court of Appeals as follows:

> In the early morning hours of August 22, 1998, police responded to a house fire on St. Joseph [S]treet in Detroit. Because the windows were barred, firefighters had to pry the bars off to gain entry. A strong smell of gasoline alerted police of possible arson. When the fire was contained, firefighters discovered a burned corpse in the bathtub; the victim had perished due to soot and smoke inhalation as well as severe burns.
>
> Defendant and codefendant [Herman] Coleman were tried together in a bench trial. Although defendant did not testify, his statement was read into the record. According to his statement, at about 3:00 a.m. on the day of the fire, he walked with

"Slim"[1] who carried something smelling of gasoline. Slim told defendant that he was going to burn down a house and that he had been paid an "eight ball"[2] to burn down a house on St. Joseph [S]treet and a house on Pierce [S]treet. Coleman asked defendant to serve as a lookout. Defendant watched as Coleman lit a rag and threw a glass jar at the house. Defendant saw flames and then took off running. Defendant indicated that he did not know anyone was in the house.

Coleman also did not testify. However, the prosecution read into the record two statements made by Coleman to police officers which tended to place responsibility on defendant and minimize Coleman's culpability. Defense counsel objected to Coleman's statements being offered against defendant. The prosecution then clarified that the statements were only being offered against Coleman. The trial court agreed that the statements would only be admissible against Coleman, not defendant.

*People v. West*, No. 222686, 2002 WL 31941002, at *1 (Mich. Ct. App. Nov. 26, 2002) (footnotes in original).

On August 11, 1999, the trial court acquitted Petitioner and Coleman of arson, but found both defendants guilty of second-degree murder, MICH. COMP. LAWS § 750.317. Petitioner was sentenced to imprisonment for sixteen to twenty-five years.

A three-judge panel of the Michigan Court of Appeals unanimously affirmed Petitioner's conviction, but on September 10, 2003, the Michigan Supreme Court vacated the court of appeals decision and remanded the case to the court of appeals. The supreme court directed the court of appeals to consider whether the trial court's apparent reliance on Herman Coleman's statements to the police was harmless beyond a reasonable doubt. *See People v. West*, 467 Mich. 868; 651 N.W.2d 918 (2002) (table).

On remand, two members of the original three-judge panel once again affirmed Petitioner's conviction. *See West*, 2002 WL 31941002. Judge Brian K. Zahra voted to reverse Petitioner's

---

[1] "Slim" is the street name for Coleman.

[2] Rock cocaine.

2

conviction. According to him, the trial court either impermissibly relied on Herman Coleman's statement to support Petitioner's conviction or, assuming the trial court mentally separated the defendants' statements, the admissible evidence was insufficient to support Petitioner's conviction.

The Michigan Supreme Court denied Petitioner's subsequent application for leave to appeal because it was not persuaded that the questions presented should be reviewed. The supreme court stated that any error in considering one defendant's statement against the other defendant was harmless beyond a reasonable doubt. *See People v. West*, 469 Mich. 922; 670 N.W.2d 227 (2003) (table).[3]

The pending habeas corpus petition is dated April 8, 2004. The grounds for relief read:

I.      Petitioner was denied both his federal and state constitutional rights to confront his accusers where the lower court considered the statement of non-testifying co-defendant against him, without such confusion the verdict of guilt was based on insufficient evidence, or was against the great weight of the evidence. US Const. Ams VI, XIV; MICHIGAN Const. 1963 ART. 1, Sec. 20.

II.     The trial court erred when it did not suppress [Petitioner's] statement to the police.

III.    Petitioner's waiver of jury trial was not understandingly and knowingly made where the court did not ascertain that the petitioner understood the right he was waiving, did not inform Petitioner of the parameters of the right to jury trial, did not adequately question [Petitioner] regarding that right and made insufficient findings.

## II.   Standard of Review

Petitioner is entitled to the writ of habeas corpus only if he can show that the state court's adjudication of his claims on the merits–

(1) resulted in a decision that was contrary to, or involved an unreasonable

---

[3] Justice Marilyn Kelly voted to grant leave to appeal.

3

application of, clearly established Federal law, as determined by the Supreme Court
of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the
facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state court
arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if
the state court decides a case differently than [the Supreme] Court has on a set of materially
indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A state court's decision
is an "unreasonable application of" clearly established federal law "if the state court identifies the
correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that
principle to the facts of the prisoner's case." *Id.* at 413. "Avoiding these pitfalls does not require
citation of [Supreme Court] cases – indeed, it does not even require *awareness* of [Supreme Court]
cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."

*Early v. Packer*, 537 U.S. 3, 8 (2002) (*per curiam* opinion) (emphasis in original).

Furthermore, state findings of fact are presumed to be correct unless the defendant
can rebut the presumption by clear and convincing evidence. 28 U.S.C. §
2254(e)(1). Finally, review is conducted in light of the law as it existed at the time
of the final state court decision, *Teague v. Lane,* 489 U.S. 288 (1989), unless an
intervening constitutional decision announces a "watershed" rule of criminal law
with implications for the fundamental fairness of the trial proceeding. *Caspari v.
Bohlen,* 510 U.S. 383, 396 (1994).

*Baze v. Parker*, 371 F.3d 310, 318 (6th Cir. 2004), *cert. denied*, __ U.S. __, 125 S. Ct. 1670 (2005).

## III.   Discussion

### A.     Co-Defendant Herman Coleman's Statement

The first habeas claim alleges that Petitioner was denied his constitutional right to confront

4

his accusers because the trial court relied on Herman Coleman's statement to the police when deciding Petitioner's case. Petitioner contends that the court confused the two statements in its findings of fact and impermissibly relied on facts in Coleman's statement to assess Petitioner's guilt or innocence.

Petitioner argues in the alternative that, if the trial court did not rely on Coleman's statement as evidence against Petitioner, Petitioner's conviction was against the great weight of the evidence and was based on insufficient evidence. According to Petitioner, his own statement to the police shows that he was not aiding and abetting the crime, but was merely present.

The Supreme Court held in *Bruton v. United States,* 391 U.S. 123 (1968), "that a defendant is deprived of his rights under the Confrontation Clause when his nontestifying co-defendant's confession naming him as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider that confession only against the co-defendant." *Richardson v. Marsh,* 481 U.S. 200, 201-02 (1987). In such a situation, "the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant" that limiting instructions are inadequate. *Bruton,* 391 U.S. at 135.

Petitioner, however, had a bench trial, and *Bruton* is not applicable to bench trials. *Rogers v. McMackin,* 884 F.2d 252, 252-56 (6th Cir. 1989). "To apply *Bruton* to bench trials would be to conclude that judges, like jurors, may well be incapable of separating evidence properly admitted against one defendant from evidence admitted against another." *Id.* at 257. "In bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions." *Harris v. Rivera,* 454 U.S. 339, 346 (1981). Trial courts are presumed to consider only properly admitted and relevant evidence in rendering its decision and to give no weight to improper

5

testimonial evidence, which is taken under objection.  *United States v. McCarthy*, 470 F.2d 222, 224

(6th Cir. 1972).  This presumption of regularity is inapplicable if it is obvious from the trial court's

findings that the court relied on evidence it had previously declared inadmissible.  *United States v.*

*Joseph*, 781 F.2d 549, 553 (6th Cir. 1986).

The trial court admitted Herman Coleman's statement against Coleman only and Petitioner's

statement against Petitioner.  The court also agreed to instruct itself, when reaching a decision in

Petitioner's case, that Coleman's statements did not apply to Petitioner (Tr. Aug. 9, 1999, at 60, 90-

91.)

The trial court ultimately announced its dispositive decision in the case without instructing

itself on the admissibility of the defendants' statements.  When summarizing the two defendants'

statements, the court appears to have separated the statements in its mind.[4]  In reaching its decision,

_____

[4] As to Herman Coleman, the court said:

Mr. Coleman admits in his statement that he made a Molotov cocktail in a beer
bottle with Mr. West.

Mr. West told Mr. Coleman that he wanted to scare someone.  He and Mr.
West went to the St. Joseph house.  Mr. West asked if he'd look out for him and
Mr. Coleman said yes.  He says Mr. West then set the cocktail on the porch and lit
it.

(Tr. Aug. 11, 1999, at 5.)

The trial court summarized Petitioner's statement as follows:

Mr. West says in his statement that he and Mr. Coleman were drinking and that
Mr. Coleman asked him to take a walk with him.

Mr. West and Mr. Coleman walked toward St. Joseph and Mr. Coleman
retrieved a glass jar and put it under his coat.  Mr. West could smell the gasoline.

When they were walking to St. Joseph, Mr. Coleman asked Mr. West to be

6

however, the court appears to have relied on both defendants' statements to find Petitioner guilty. The court said:

> What each statement admits as to the person making it is that they went together to the St. Joseph house with an incendiary device containing gasoline knowing that the motive was to at least scare Mr. Johnson; that each one aided the other in acting as a lookout, and that Mr. Johnson died as a result of a fire in which he was burned.
>
> . . . .
>
> Here the defendants took an incendiary device to a place where they knew Mr. Johnson was, a device that creates a very high risk of death or great bodily harm. And with the intent to scare Mr. Johnson which is to use it against him. This device did cause Mr. Johnson's death and I find the defendants guilty of Second Degree Murder.

(*Id*. at 6-7.) When ruling on the arson charge, the trial court stated that "the defendants' intent was to scare Mr. Johnson and put him in fear." (*Id*. at 7.)

The intent to scare someone was mentioned only in Herman Coleman's statement to the police. Coleman twice said in his first statement to the police that Petitioner had wanted to scare someone. *See* App. B. Petitioner, on the other hand, informed the police that he had not been to the house previously and did not know anyone was located in the house when Coleman set it on fire. *See* App. A.

Thus, it appears that the trial court used Herman Coleman's statement to reach a decision in Petitioner's case. The Michigan Court of Appeals arrived at the same conclusion when it stated in its unanimous decision dated December 7, 2001, that "portions of the court's findings could only

---

his lookout according to Mr. West. When they arrived at St. Joseph, he stated Mr. Coleman lit the cocktail and threw it in the front door.

(*Id*. at 5-6.) The court correctly noted that "[b]oth statements tend to incriminate the other person and diminish the activities of the writer. (*Id*. at 6.)

be attributed to assertions made in Coleman's statement - not defendant's." *People v. West*, No. 333686, 2001 WL 1565537, at *1 (Mich. Ct. App. Dec. 7, 2001). On remand, the court of appeals stated that "the trial court mentally separated the evidence admitted against Coleman from that admitted against defendant when rendering the verdict." *West*, 2002 WL 31941002, at *2. The court nevertheless admitted that, "[i]n its recitation of factual findings, [the trial court] referenced facts that were proven by way of Coleman's statements." *Id*. And the Michigan Supreme Court opined that the trial court may have considered one defendant's statement in determining the guilt of the other defendant.

### 1.    Harmless Error Analysis

The Michigan Court of Appeals concluded on remand that, "even if the trial court improperly relied on Coleman's statements in determining defendant's guilt, the error was harmless because the essential elements of the crime were proved beyond a reasonable doubt even without Coleman's statements." The Michigan Supreme Court subsequently stated that, "[w]hile it appears that the Wayne Circuit Court may have considered the out-of-court statement of one defendant in determining the guilt of the other, any such error was harmless beyond a reasonable doubt on the facts of this case." *West*, 469 Mich. at 922; 670 N.W.2d at 227.

The Court may not grant habeas relief "if the state court simply erred in concluding that the State's errors were harmless; rather, habeas relief is appropriate only if the [state courts] applied harmless-error review in an 'objectively unreasonable' manner." *Mitchell v. Esparza*, 540 U.S. 12, 18 (2003) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75-77 (2003)). A state court's determination of harmlessness is considered "unreasonable" if the error had a substantial and injurious effect or influence on the factfinder and resulted in actual prejudice. *Brecht v. Abrahamson*, 507 U.S. 619,

8

637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *Barker v. Yukins*, 199

F.3d 867, 872 (6th Cir. 1999). Federal courts must treat an error as if it had a substantial and

injurious effect on the factfinder when the court has a grave doubt and finds itself in virtual

equipoise as to the harmlessness of the error. *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995). With

these principles in mind, the Court will proceed to examine the evidence to determine whether,

without Coleman's statement to the police, the prosecutor produced sufficient evidence to establish

that Petitioner committed second-degree murder beyond a reasonable doubt.[5]

### 2.    Sufficiency of the Evidence

The critical inquiry on review of the sufficiency of the evidence to support a criminal

conviction is

> whether the record evidence could reasonably support a finding of guilt beyond a
> reasonable doubt. [T]his inquiry does not require a court to 'ask itself whether *it*
> believes that the evidence at the trial established guilt beyond a reasonable doubt.'
> Instead, the relevant question is whether, after viewing the evidence in the light most
> favorable to the prosecution, *any* rational trier of fact could have found the essential
> elements of the crime beyond a reasonable doubt.

*Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (internal citation and footnote omitted) (emphasis

in original). This "standard must be applied with explicit reference to the substantive elements of

the criminal offense as defined by state law," *id.*, 443 U.S. at 324 n.16, and through the framework

of 28 U.S.C. § 2254(d), *Martin v. Mitchell*, 280 F.3d 594, 617 (6th Cir. 2002). "A reviewing court

does not reweigh the evidence . . . ." *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003).

### a.    Second-degree Murder and Malice

In Michigan,

_____

[5] Petitioner's great-weight-of-the-evidence claim is subsumed by his sufficiency-of-the-
evidence claim.

> [t]he elements of second-degree murder are: (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse. *People v. Bailey*, 451 Mich. 657, 669; 549 N.W.2d 325 (1996).
>
> Malice is defined as the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm. *People v. Aaron*, 409 Mich. 672, 728; 299 N.W.2d 304 (1980).

*People v. Goecke*, 457 Mich. 442, 463-64; 579 N.W.2d 868, 878 (1998). "[T]he mens rea for second-degree murder does not mandate a finding of specific intent to harm or kill" or even "an actual intent to cause a particular result." *Id.*, 457 Mich. at 466; 579 N.W.2d at 879. "The intent to do an act in obvious disregard of life-endangering consequences is a malicious intent." *Id.* A fact finder "can properly infer malice from evidence that a defendant intentionally set in motion a force likely to cause death or great bodily harm." *People v. Aaron*, 409 Mich. 672, 729; 299 N.W.2d 304, 327 (1980)).

While it would be reasonable for a jury to conclude that a fire set with gasoline in a building with residences nearby is evidence of wanton disregard that death or great bodily harm might follow, a jury could also reasonably conclude that death or great bodily harm was the natural tendency of such conduct. *People v. Djordjevic*, 230 Mich. App. 459, 463; 584 N.W.2d 610, 612 (1998). "A reasonable jury could conclude that the danger to the arsonist, neighbors, or fire fighters was sufficiently high to allow for the conclusion that death or great bodily harm was the natural tendency of the act." *Id.*

### b.    Aiding and Abetting

"In situations involving the vicarious liability of cofelons, the individual liability of each felon must be shown. It is fundamentally unfair and in violation of basic principles of individual criminal culpability to hold one felon liable for an unforeseen death that did not result from actions

agreed upon by the participants." *People v. Turner*, 213 Mich. App. 558, 566-67; 540 N.W.2d 728, 733 (1995), *overruled in part on other grounds*, *People v. Mass*, 464 Mich. 615, 627-28; 628 N.W.2d 540, 548 (2001)).  When the state seeks to convict an aider and abettor of a substantive offense, "the prosecution must establish that the aider and abettor 'himself possess[ed] the required intent or participate[d] while knowing that the principal possessed the required intent.'  The aider and abettor's 'specific intent or his knowledge of the principal's specific intent may be inferred from circumstantial evidence.'"  *Warren v. Smith*, 161 F.3d 358, 361 (6th Cir. 1998) (citations and footnote omitted).     Aiding and abetting encompasses "all forms of assistance rendered to the perpetrator of the crime and comprehends all words or deeds which may support, encourage or incite the commission of a crime.  Mere presence even with knowledge that an offense is about to be committed, is not enough to make one an aider and abettor." *People v. Vicuna,* 141 Mich. App 486, 495; 367 N.W.2d 887, 891 (1985) (internal citations omitted), *disapproved of on other grounds by People v. Dalessandro*, 165 Mich. App. 569; 419 N. W. 2d 609 (1988).  "However, 'other factors such as a close association between the defendant and the principal actor, his participation in planning or executing the crime, and evidence of flight after the crime could be considered in determining whether there was sufficient evidence that he acted in concert with the principal.'" *People v. Spearman*, 195 Mich. App. 434, 441; 491 N.W.2d 606, 610 (1992) (quoting *People v. Anderson*, 166 Mich. App. 455, 475; 421 N.W.2d 200, 210 (1988)), *reversed in part on other grounds*, *People v. Rush*, 443 Mich. 870; 504 N.W.2d 185 (1993).

### c.     The Facts and State Court Decision

The Michigan Court of Appeals summarized the evidence as follows:

Defendant went with Coleman to a vacant field to pick up something that smelled of gasoline.  Coleman told defendant that he was going to burn down a house and had

11

been paid an "eight ball" to do so.  On their way to the house, Coleman asked
defendant to serve as a lookout.  Defendant knew which house was to be burned
when Coleman kept walking around it.  Defendant waited and watched as Coleman
circled the house, lit a rag, and threw a glass jar inside a small hallway of the house.
When defendant saw flames, he "took off running."  The fire was set in proximity
of the security bars on the front door.  As a result, the victim was unable to escape
by way of the door.  The victim was found in the bathtub, his death caused by soot
and smoke inhalation and severe burns.

*West*, 2002 WL 31941002, at *3.

Judge Zahra correctly stated in his dissenting opinion that there was no admissible evidence

demonstrating that Petitioner intended to scare the victim or knew the victim was in the house.  The

majority of judges, however, stated that "the natural tendency of burning a house in a residential

neighborhood would be to cause death or great bodily harm."  *Id*.  The court of appeals went on to

say that "neither defendant's knowledge of occupancy of the home nor Coleman's motive were

required to convict him as an aider and abettor of second-degree murder."  *Id*.  The court of appeals

concluded that, "even if the trial court improperly relied on Coleman's statements in determining

defendant's guilt, the error was harmless because the essential elements of the crime were proven

beyond a reasonable doubt even without Coleman's statements."  *Id*.

### d.    Application

There was no admissible evidence that Petitioner planned the crime with Coleman, that he

verbally agreed to be a look-out, or that he knew anyone was staying in the house on St. Joseph

Street.  However, he admittedly accompanied Coleman to the house, knowing that Coleman

possessed gasoline, intended to burn down a house, and wanted him (Petitioner) to serve as a look-

out.  Petitioner also watched from across the street while Coleman circled the house a few times and

set the house on fire.  In addition, Petitioner fled after he saw flames.

A rational trier of fact could have inferred from Petitioner's actions that he agreed to help

Herman Coleman by serving as a look-out.  A rational juror also could have inferred that Petitioner knew Coleman intended to set in motion a force likely to cause death or great bodily harm or intended to do an act in obvious disregard of life-endangering consequences.  It was foreseeable that someone (whether Coleman himself, an occupant of the house, neighbors, or a firefighter) would suffer great bodily harm or death as a result of burning the house.

While it is a close question, the Court believes the prosecutor established the elements of second-degree murder beyond a reasonable doubt.  Any error in considering Herman Coleman's statement to the police could not have had a substantial and injurious effect or influence on the trial court's decision and did not result in actual prejudice.  Consequently, the state court's finding of harmless error did not result in a decision that was contrary to, or an unreasonable application of, Supreme Court precedent, and Petitioner is not entitled to the writ of habeas corpus on the basis of his first claim.

**B.      Admission of Petitioner's Statement**

The second habeas claim alleges that the trial court erred when it declined to suppress Petitioner's statement to the police.  Petitioner alleges that Officer Barbara Simon read his constitutional rights to him at 5:10 a.m. on September 13, 1998, and that he asserted his right to remain silent.  Petitioner further alleges that Officer Herlotha Fields re-interviewed him at 5:55 a.m. on the same day, a mere twenty-five to forty-five minutes after he informed Officer Simon that he wished to remain silent.  Petitioner claims that his statement to Officer Fields was inadmissible because the police did not scrupulously honor his right to remain silent.  The trial court ruled that Petitioner's statement to Officer Fields was admissible, and the Michigan Court of Appeals concluded that the trial court did not err when it admitted the statement.

13

### 1.      The Right to Remain Silent

The Fifth Amendment provides that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself . . . ."  U. S. CONST. amend. V.  To protect a suspect's Fifth Amendment right to remain silent, an individual who

> is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning . . . must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966).

> Once [these] warnings have been given, the subsequent procedure is clear.  If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.  At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise.  Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.

*Id*. at 473-74 (footnote omitted).

The Supreme Court subsequently explained in *Michigan v. Mosley*, 423 U.S. 96, 102-03 (1975), that

> neither this passage nor any other passage in the Miranda opinion can sensibly be read to create a per se proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent.

"[T]he admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his 'right to cut off questioning' was 'scrupulously honored.'"  *Id*. at 104.

### 2.      The Facts

14

The record indicates that Petitioner was arrested about 8:30 p.m. on September 10, 1998, for carrying a concealed weapon. He was first questioned about the arson and murder by Sergeant Cathy Adams on the following day, September 11. When Sergeant Adams asked Petitioner whether he wanted to make a statement, he said, "No." Petitioner eventually was taken back to his cell. The next morning, September 12, he was asked again whether he knew anything about the firebombing and wanted to make a statement. He denied knowing anything about the crime and he said that he did not want to make a statement. He was taken back to his cell. (Tr. Feb. 8, 1999, at 32-36.)

Officer Barbara Simon attempted to interrogate Petitioner at 5:10 a.m. on September 13, 1998. Officer Simon advised Petitioner of his constitutional rights, but took Petitioner back to his cell when he stated that he knew nothing about the firebombing and did not want to talk to her. The entire interview took approximately fifteen to twenty minutes. Officer Simon then left a note for Sergeant Adams, saying that Petitioner should be re-interviewed because Herman Coleman placed Petitioner at the scene, but Petitioner claimed that he knew nothing about the firebomb. (*Id*. at 4-6, 36-37, and 47-49; Tr. Jan. 29, 1999, at 57-61.)

Officer Herlotha Fields interviewed Petitioner later on the same day. He advised Petitioner of his constitutional rights at 4:55 p.m. and took a statement from Petitioner at 5:55 p.m., not 5:55 a.m. Officer Fields testified at a pretrial evidentiary hearing and at trial that Petitioner was cooperative and at no time did he request an attorney or say that he did not want to talk to Fields. (Tr. Jan. 29, 1999, at 62-68; Tr. Aug. 9, 1999, at 55-58.) Petitioner, on the other hand, testified at the evidentiary hearing that he initially refused to make a statement, but ultimately made and signed a statement after Fields informed him that the police had no evidence on him and that he could go home if he made a statement. (Tr. Feb. 8, 1999, at 37-41, 50-52.)

15

Petitioner argued through counsel at the evidentiary hearing that his statement was involuntary because it was induced by Officer Fields' illusory promise that he would be released if he made a statement. Petitioner has not made the same argument here. He argues only that the police did not honor his request to remain silent. As evidence of this, he alleges that Officer Fields interrogated him a mere twenty-five to forty-five minutes after Officer Simon attempted to question him. The record, however, indicates that Officer Simon honored Petitioner's right to remain silent and that Officer Fields sought to obtain a statement from Petitioner about eleven hours later. Petitioner himself testified at the evidentiary hearing that Officer Simon questioned him about 4:30 or 5:00 a.m. on September 13 and that Officer Fields questioned him that afternoon. (*Id*. at 36-37.)

In *Mosley*, both interrogations occurred in one afternoon, and the Supreme Court concluded that the admission of Mosley's incriminating statement did not violate *Miranda*. The interval between Investigator Simon's interrogation of Petitioner and Officer Field's interrogation was much longer than the interval between the two interrogations in *Mosley*. Moreover, both Investigator Simon and Officer Fields advised Petitioner of his constitutional rights. Neither officer "refus[ed] to discontinue the interrogation upon request [n]or . . . persist[ed] in repeated efforts to wear down [Petitioner's] resistance and make him change his mind." *Mosley*, 423 U.S. at 105-06. The Court therefore concludes that the state court's adjudication of Petitioner's claim on the merits was not contrary to, or an unreasonable application of, Supreme Court precedent, and Petitioner is not entitled to relief on the basis of his second claim.

### C.   The Waiver of a Jury Trial

The third and final habeas claim alleges that Petitioner's waiver of a jury trial was not understandingly and knowingly made and that the requirements of state law were not satisfied when

16

the trial court inquired about Petitioner's waiver of his right to a jury trial. Petitioner contends that the trial court did not ascertain whether he understood the right he was waiving, did not inform him of the parameters of the right to a jury trial, did not adequately question him regarding the right, and made insufficient findings concerning his waiver of the right. Petitioner claims that he did not realize he was substituting the trial judge for the jury as factfinder. In addition, he says that he was not informed that a jury verdict requires unanimity, and he was not asked whether he was threatened or promised anything to make him waive his right to a jury trial.

### 1.     The State and Federal Issues

The alleged violations of the Michigan Court Rules are not grounds for habeas relief, because "federal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2241; *Rose v. Hodges*, 423 U.S. 19, 21 (1975) (per curiam)." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).

The constitutional question is whether Petitioner's waiver of a jury trial was "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). Resolution of this question depends on the relevant facts and circumstances. *Id*.

"A waiver may be voluntary, knowing, and intelligent if the defendant has a minimum amount of knowledge concerning his jury trial right and the mental capacity to understand the implications of the waiver of that right." *Lott v. Coyle*, 261 F.3d 594, 615 (6th Cir. 2001) (citing *United States v. Martin*, 704 F.2d 267, 273 (6th Cir. 1983)). The defendant must understand "that the choice confronting him was, on the one hand, to be judged by a group of people from the community, and on the other hand, to have his guilt or innocence determined by a judge." *Sowell*

17

*v. Bradshaw*, 372 F.3d 821, 836 (6th Cir. 2004) (quoting *United States v. Sammons*, 918 F.2d 592, 597 (6th Cir. 1990) (quoting *United States ex rel. Williams v. De Robertis*, 715 F.2d 1174, 1180 (7th Cir. 1983)), *cert. denied*, __ U.S. __, 125 S. Ct. 1645 (2005). "[C]olloquies are not constitutionally required," and "an extremely perfunctory waiver with no colloquy" is constitutionally adequate. *Sowell*, 372 F.3d at 834 (citing *Martin*, 704 F.2d at 274-75). Furthermore, courts must give "presumptive force" to written waivers of a jury trial. *Spytma v. Howes*, 313 F.3d 363, 371 (6th Cir. 2003).

### 2.     The Facts and State Court Decision

Petitioner's attorney stated as early as May 7, 1999, that Petitioner might wish to have his case tried with the trial judge sitting as the fact finder. (Tr. May 7, 1999, at 5.) When the focus of the proceeding on May 7, 1999, turned to the matter of a plea offer and whether Petitioner understood the sentence that was being offered as part of the plea bargain, Petitioner said that he understood, but that he "was going with the bench trial." (*Id*. at 7.) Petitioner later acknowledged that he had signed a written waiver of his right to a jury trial. He claimed to understand that he was entitled to make the decision and that any finding of guilt or innocence by the trial judge had the same force and effect as a decision by a jury. He said that he had been given enough time to think about the matter and that he wanted to waive his right to a jury trial. The trial court accepted Petitioner's statements as a knowing and voluntary waiver. (*Id*. at 9-10.) The Michigan Court of Appeals stated on review of Petitioner's claim that the trial court complied with the requirements of state law and did not err when it determined that Petitioner validly waived his right to a jury trial. The court of appeals opined that Petitioner received an adequate explanation of his waiver and that his waiver was knowingly, voluntarily, and understandingly made. In reaching these conclusions,

18

the court noted that Petitioner did not demonstrate any concern about waiving his right to a jury trial at any time after the waiver hearing or during trial and that Petitioner had signed a written waiver form indicating that he knowingly waived his right to a jury.

The state court's adjudication of Petitioner's claim was objectively reasonable.  It appears from defense counsel's comments that Petitioner had discussed the matter with his attorney, and he was informed by the trial court that the court, and not a jury, would be deciding his case if he waived a jury.  The trial court did not inform Petitioner that a jury verdict must be unanimous, and the court did not ask Petitioner whether he was promised anything or threatened by anyone.  However, perfunctory colloquies are constitutional, *Sowell*, 372 F.3d at 834, and there is no indication in the record that Petitioner was promised anything or threatened in order to make him waive his right to a jury.  "[T]he record does not disclose any evidence that [P]etitioner was so unaware of the rudimentary elements of trial by jury that his waiver cannot stand."  *Spytma*, 313 F.3d at 371.  The Court concludes that Petitioner's waiver of a jury trial was voluntary and intelligent and that the state court's adjudication of his claim on the merits was not contrary to, or an unreasonable application of, Supreme Court precedent.

## IV.    Conclusion

For all the reasons given above, the Court concludes that Petitioner is not entitled to habeas corpus relief.  Accordingly,

**IT IS ORDERED AND ADJUDGED** that the application for the writ of habeas corpus [Doc. #3, July 19, 2004] is **DENIED**.

**IT IS FURTHER ORDERED** that, if Petitioner desires to seek a certificate of appealability ("COA"), he may file a **MOTION** for a COA with this Court within **THIRTY (30) DAYS** of filing

a notice of appeal and shall support this motion with an appropriate brief, both of which shall comply with the Local Rules of this Court. *See Castro v. United States*, 310 F.3d 900, 903 (6th Cir. 2002) (**"We do encourage petitioners as a matter of prudence to move for a COA at their earliest opportunity so that they can exercise their right to explain their argument for issuance of a COA."** (emphasis added). Respondent may file a response with an appropriate brief, both of which shall comply with the Local Rules, within **TWENTY (20)**

 **DAYS** of service of Petitioner's motion for a COA.

Dated:   February 28, 2006                       s/Paul V. Gadola
                                                 HONORABLE PAUL V. GADOLA
                                                 UNITED STATES DISTRICT JUDGE

---

Certificate of Service

I hereby certify that on   March 2, 2006  , I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following:
                            Laura G. Moody                                , and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants:                Anthony West                           .

                                                 s/Ruth A. Brissaud
                                                 Ruth A. Brissaud, Case Manager
                                                 (810) 341-7845

20

**APPENDIX A**

## PETITIONER'S STATEMENT TO THE POLICE

Petitioner's narrative statement to Officer Herlotha Fields reads in pertinent part as follows:

[QUESTION by Officer Fields]:  Mr. West, are you willing to give me a true statement about the fire that happened at 2803 St. Joseph on 8-22-98 at approximately 3:00 A.M., when Robert Johnson A.K.A. Beatdown was killed?

ANSWER [by Petitioner]:  I was at a friend of mine's house.  Her name is Zola.  She lives on Andex.  It was about 9 P.M. when I got to Zola's house.  I had picked up my girl friend Christina Meriweather and we went to get something to eat.  So we had just got to Zola's house.  We was there just sittin' around talking.  It was me and my girl, Slim, Kizzie.  We was there sittin' on the front porch.  Then around 10 P.M. this guy we [call] Gino Rose, A.K.A. Ang[el], pulled up in his brown car, have (sic) between a 95-96.  He did not get out of the van.

Slim walked over to the van on the driver's side, then he went around and got into the back.  Ang[el]'s girl friend was in the front passenger seat . . . .  Before Slim got into the van, him and Angel were talking.  I heard Ang[el] tell Slim this is for you.  I seen him give Slim a eight-ball, then I heard Ang[el] telling Slim let's go to the gas station first.  Let's go to the gas station first.

Slim walked around and got into the back of the van.  Then they pulled off and they were gone for 30 to 45 minutes before they returned.

After Slim got back, Slim and Zola went into the house.  They smoked some crack cocaine.  They were only in the house for about five minutes before the both of them came back outside.  We sat around and drank some more beer, then Slim's wife called me on my cell phone to tell me to tell Slim to come home.  He did not leave right away.

After Slim left, we still sittin' around drinking.  My girl had went to the store.  Slim was only gone for about 35 minutes before he came walking back the way.  After he got back, Slim drink a beer then a few minutes later Slim asked me to walk with him over on Grandy.

We was walking north on Joseph Campau.  That's when I asked Slim what did Angel give him and he said a eight-ball.  He was talking about rock cocaine.

When we left from Zola's house, there is a . . . vacant field on the side of her house.  Slim walked to the back of the field and picked up something and placed it under his jacket.  You could smell the gas as we were walking.

22

As we were walking, I asked Slim what was he going to do with the gas. Slim said he was going to burn down the house.  At first I did not know which one it was not until we got all the way down St. Joseph --down to St. Joseph. That's when I knew he was going to burn down that house.

He kept on walking around it.  I was standing across the street by the big tree.  He asked me to be his look-out as we were walking down to St. Joseph. After Slim had walked around the front and side of the house about two to three times, that's when he lit the rag and threw the glass jar near the side, the small hallway of the house.  I seen the flames when they came up.

I took off running south on Grandy.  I think Slim ran down St. Joseph. When I got to Benson and Joseph Campau, I seen Slim coming from between two vacant houses.  When we met back up, he told me he had hurt his leg and -- he had hurt his leg as we were walking back to Zola's house.  Slim said he could not have gotten both of them at the same time.  I asked him what was he talking about.  That's when he told me he was to burn down the other house on Percy at Chene at Grandy.

We walked back to Zola's house.  When we got back to Zola's house, I sat on her front porch.  Slim went on around the corner. . . .

I sat outside for about an hour, then I went upstairs and went to sleep.

(Tr. Aug. 9, 1999, at 59-67.)

The interrogation continued as follows:

QUESTION [by Officer Fields]:  Did Slim tell you why Angel wanted the house burned down?

ANSWER [by Petitioner]:  No, he just said that Ang[el] just wanted the house out of the way.

QUESTION:  Did you ever go with Ang[el] and Slim to get the gas to burn down the house on St. Joseph?

ANSWER:  No.

QUESTION:  Did you thought -- did you threw (sic) a firebomb into the house on St. Joseph?

ANSWER:  No.

23

QUESTION:   When did you find out that Beatdown had been killed in the house fire on St. Joseph?

ANSWER:  A guy by the name of Dave came around to Zola and told her Beatdown had been killed.

QUESTION:  Did you know that anyone was in the house when Slim set it on fire?

ANSWER:  No.

QUESTION:  Was (sic) drugs being sold from the house on St. Joseph?

ANSWER:  I don't know.  I had never been there before.

QUESTION:  Is this a true statement?

ANSWER:      Yes.

QUESTION:  Did anyone force you to make this statement?

ANSWER:      No.

QUESTION:  Did anyone promise you anything to make this statement?

ANSWER:      No.

QUESTION:  How long have you known Ang[el]?

ANSWER:      Only for about one - two months.

QUESTION:   What is Ang[el]'s girl friend's name?

ANSWER:      They call her Chin, [black female], light complexion, five six, 140.  She lives at 14152 Promenade, the upper flat.

QUESTION:   Describe Ang[el].  Ang[el] he is a [black male], 25, 26, five eight, 20, light complexion, low-cut fade.

QUESTION:   What is [S]lim['s] real name and descri[ption]?

ANSWER:      All I know is Johnny.  That's what I heard his wife call him.  He is a [black male], [age] 45 to 50, six three, slim built, 185 to 200, dark complexion, lives on McDougall and the Hunt area.

24

QUESTION:   What kind of jacket does Slim have on when he picked up the gas?

ANSWER:     It was a black cloth jack[et] with Ohio State in red and trim[med] in white around the collar and sleeves.

QUESTION:   Did Slim tell you . . . what the eight-ball was for?

ANSWER:     Yes, Slim told me Ang[el] had given him the eight-ball to burn down t[he] house, the house on St. Joseph and the house on Pier[ce].

QUESTION;   Do you know if the house on Pierce was ever burned?

ANSWER:     No, it was never burned.

(*Id*. at 67-72.)

**APPENDIX B**

## HERMAN COLEMAN'S FIRST STATEMENT TO THE POLICE

Herman Coleman's first statement to the police reads as follows:

QUESTION [by Investigator Simon]:   What can you tell me about the death of Mr. Robert Johnson which occurred on 82298?

ANSWER [by Herman Coleman]:    It was about 3:00 p.m., 3:30 p.m. (8-22-98) when I met up with West.  He asked me if I could help him make a Molotov cocktail because he wanted to scare someone.  Me and West went to the vacant garage.  We poured the gas in a small beer bottle.  After we left the garage, me and West had a few drinks and left.  Later on that evening, I got back with West.  We drove over on St. Joseph.  West got out of the car.  He was gone for a few minutes.  When he came back to the car, he drove off the next day, that's when I learned that Beatdown had got burn up in the house.

QUESTION:  How did you and Anthony make the cocktail?

ANSWER:    We just put the gas into the beer bottle and put a rag in it also.

QUESTION:  Do you know the person who Mr. West wanted to scare?

ANSWER:    No, he didn't tell me the person's name.

QUESTION:        When you and Mr. West drove over to St. Joseph Street, did you   get out of the car with Mr. West?

ANSWER:    When we got on St. Joseph, me and West both got out of the car.  West asked me if I was all right.  I told him that I had buzz.  I got back in the car and West took the bottle with the gas and walked down the street.

QUESTION:  When Mr. West returned to the car, did he have the bottle of gasoline with him?

ANSWER:    No.

QUESTION:        Was Mr. West having any problems with Mr. Robert --
Robert   Johnson (Beatdown)?

ANSWER:    I don't know.

QUESTION:        After Mr. West returned to the car, what did he tell you?

ANSWER:    Nothing.  He just drove off.

27

QUESTION:          Do you know what two streets you were between on St. Joseph:

ANSWER:     West didn't park on St. Joseph.  He parked on the side street and walked down St. Joseph.

QUESTION:          Do you know West['s] full name?

ANSWER:     No, I don't.

[QUESTION:]  Mr. Coleman, who is Gino?

ANSWER:     I don't know a Gino.

[QUESTION:]  Mr. Coleman, who is Angel?

ANSWER:     He some guy who always talking to West.

QUESTION:  Can you give me a description of Angel?

ANSWER:     Black male, 26, twenty-seven, five four to five six, 200 pounds, stocky built, light complexion, low fade haircut, clean shaven.

QUESTION:  Do you know Angel's full name?

ANSWER:     No, I don't.

QUESTION:  How long have you known Angel?

ANSWER:     A few months.

QUESTION:  Mr. Coleman, who paid West to firebomb the house on St. Joseph?

ANSWER:     Who paid him?

QUESTION:  Yes.  Who paid West to firebomb the house on St. Joseph?

ANSWER:     I don't know.  He told me that he wanted to -- he just -- I'm sorry, I      don't know.  He told me that he wanted to scare someone.

(Tr. Aug. 9, 1999, at 120-23.)

28

**APPENDIX C**

**HERMAN COLEMAN'S SECOND STATEMENT FO THE POLICE**

Herman Coleman's second statement to the police reads:

QUESTION [by Police Officer Gregory Jones]:  You made a statement prior to this one to Investigator Simon.  Did you tell her everything about the fire bombing on St. Joseph?

ANSWER:  No, I told her I didn't get out of the car with West, but I did.  I went with West.

QUESTION:  Tell me what happened.

ANSWER:    I went around on St. Joseph with West and he said this the place here.  West asked me if I was looking out for him and I said yeah.  West set the cocktail down by the front door and lit it with a lighter.  It started blazing real big.  We walked away.  I walked to the next street and West walked to his car.

QUESTION:  Did West say anything after he lit the cocktail?

ANSWER:    No, he just put it (sic) hands in his pocket and walked away.

QUESTION:  Where did West get the cocktail from?

ANSWER:    That's the one Angel and West asked me to make for him.

QUESTION:  Were you suppose (sic) to get any payment for making the cocktail?

ANSWER:    Angel said he would give me an eight for making it, but I never got it.

QUESTION:  What do you mean by a eight?

ANSWER:    Cocaine.

QUESTION:  Where did you make the cocktail at?

ANSWER:    I think it was abandoned garage on Heidelberg.

QUESTION:  What did you make the cocktail out of this?

ANSWER:    A rag, a beer bottle and some gasoline.

30

QUESTION:   How did you get in touch with West to give him the cocktail?

ANSWER:       I called him on his cell phone number 215-7577.

(Tr. Aug. 9, 1999, at 95-97.)